## UNITED STATED DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jennifer Styczinski, Thomas Styczinski, and on behalf of the minor A.S, | Court File No. 24-2664 Case Type: Other Civil |
| Plaintiffs, | |
| v. | **Complaint for Violation of Civil Rights under the First Amendment and Fourteenth Amendment** |
| City of Eden Prairie, Valerie Verley in her individual and official capacities as Community Center Manager, or her successor in their official capacity, and Amy Markle, in her official capacity as the City's Parks and Recreation Director, or her successor in their official capacity, | Jury Trial Demand |
| Defendants. | |

The plaintiffs Jennifer Styczinski and Thomas Styczinski, and on behalf of the minor A.S, bring this action against the City of Eden Prairie, Valerie Verley, Community Center Manager in her individual and official capacities, and Parks and Recreation Director Amy Markel in her official capacity as successor to former Director Jay Lotthammer, or her successor in their official capacity as follows:

### Introduction

This civil rights lawsuit is based on the unconstitutionality of the City of Eden Prairies verbal abuse policy, used and enforced in the City's community center, under the First Amendment of the U.S. Constitution both facially and as-applied. Community center employees enforced the abuse policy against the Plaintiffs Jennifer Styczinski, Thomas

Styczinski, and their minor child A.S. during a family outing at the center's pool, an incident of which caused them to be banned from the aquatics area for an extended period of time. In addition, the policy contained a *mens rea* element that once enforced, failed to provide any evidentiary process or appellate process to challenge the decision. The failure of having an appellate process also implicates a violation of due process under the Fourteenth Amendment, and where appropriate, nominal or monetary damages or both.

Jennifer Styczinski, Thomas Styczinski, and their minor child A.S., seek actual and nominal damages, as well as declaratory and injunctive relief.

## Jurisdiction

1.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343 (1)-(4) and 42 U.S.C. §§ 1983, 1985(2), (3) and § 1988 (civil rights statutes) for violations of the U.S. Constitution.

2.      This Court is authorized to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, Federal Rules of Civil Procedure 57 and 65, and has general legal and equitable powers.

3.      Venue is proper in this Court under 28 U.S.C. § 1391 and other applicable law, because the alleged deprivations of constitutional rights occurred in counties located within this District of Minnesota, and future deprivations of its constitutional rights are threatened and are likely to occur in this District.

## Parties and Factual Background

4.    Plaintiffs Jennifer and Thomas Styczinski (Jenny and Tom) are husband and wife, respectively, and A.S. is their minor son who reside in Eden Prairie, Hennepin County, Minnesota. Jenny and Tom also have a minor daughter E.S. who is not a party to this action.

5.    Defendant City of Eden Prairie is a municipality located in Hennepin County, Minnesota.

6.    Defendant Valerie Verley is the Community Center Manager of the EPCC, who is sued in her individual and official capacities.

7.    Defendant Jay Lotthammer was the Parks and Recreation Director for the City of Eden Prairie until he retired in October, 2023. The current Parks and Recreation Director is Amy Markle, or her successor, who is sued in her official capacity.

8.    The following documents are attached as Exhibits to this complaint:

| Ex. No. | Description |
|---------|-------------|
| 1 | EPCC Behavior Guidelines: Verbal Abuse Policy (last accessed May 23, 2024) |
| 2 | April 7, 2022 – Email from Valerie Verley to Jennifer Styczinski |
| 3 | July 15, 2022 – Video footage EPCC Lap Pool B |
| 4 | July 20-21, 2022 – Verley Email exchange with Jenny and Tom Styczinski |
| 5 | July 22, 2022 – Email from Tom Styczinski to Jay Lotthammer |
| 6 | July 25, 2022 – Verley response to the Styczinski's July 22, email of initial questions |
| 7 | Styczinskis Recommendations to EPCC |
| 8 | August 31, 2022 – Lotthammer Email to Jenny and Tom "Pool & Fitness Floor Incidents" |
| 9 | August 1, 2023 – Styczinskis letter to Eden Prairie City Manager Rick Getschow |
| 10 | August 1–September 7, 2023 – Email exchange between City Manager Getschow and Tom Styczinski |
| 11 | September 2023 Styczinski swimming trip costs |
| 12 | Eden Prairie Community Center Policies |

**The Eden Prairie Community Center as a facility open to the general public and namely Eden Prairie residents.**

9.      Defendant City of Eden Prairie owns and operates the Eden Prairie Community Center (EPCC), a recreational facility for paid use by walk-in participants, as well as monthly or annual members.

10.      The EPCC is also supported by taxpayer funds.

11.      Unless entering the facility under a fee assistance program, EPCC day passes are available for a fee at a lower rate for residents of Eden Prairie, and a slightly higher rate for non-residents.

12.      As Eden Prairie residents, the Styczinski family are entitled to pay for and visit the Eden Prairie Community Center (EPCC's) which has, among its facilities and amenities, an aquatic area.

13.      EPCC staff are government employees or officials or both.

14.      The City has promulgated policies governing public conduct with the EPCC. This includes, so-called "Behavior Guidelines," among which is a "Verbal Abuse" policy. **Exhibit 1.**

15.      The City of Eden Prairie adopted and is responsible for EPCC policies governing conduct within the facility.

16.      The Eden Prairie Community Center Verbal Harassment Policy definition of "verbal abuse" is accurately quoted as follows:

> Verbal abuse is speaking with the intent to demean, humiliate, blame, or threaten. This includes, but is not limited to, name calling, personal attacks, condescension, criticism aimed at the particular individual, degradation, manipulation, blame, accusations, blatantly ignoring staff

4

enforcing building policy and refusing to comply, circular arguments or threatening a particular individual.

**Exhibit 1.**

17.     The Styczinski family had been EPCC members since approximately 2015 and all family members were familiar with EPCC rules and normative behavior from their years of membership and use of the EPCC.

18.     Notably, the Styczinski family were EPCC members primarily for the year-round use and enjoyment of the facility's aquatics area, however, used other amenities as well.

> **The Styczinski family, while engaged in speech activities with EPCC employees or officials were banned from the aquatics area.**

19.     The Styczinski family was banned from the EPCC aquatic area after twice civilly voicing criticisms to EPCC employees or government officials or both. The governmental action resulting in the ban from the aquatic area was based upon allegations of violating the City's Verbal Abuse Policy for the EPCC.

20.     The first incident occurred on, or around April 5, 2022. Here, the Styczinski family encountered EPCC staff over a minor incident involving A.S. that ultimately lead to their ban from the aquatic area stemming from and a second encounter with EPCC staff on July 15, 2022.

> *The April 5 "Wet Shoes" first interaction with staff.*

21.     On or around April 5, 2022, the Styczinski family visited the EPCC.

22.     On that day A.S. was alone, climbing up the stairs en route to the EPCC fitness floor, when he encountered an uncredentialed EPCC staff member who was wearing

workout clothes, but not wearing an EPCC uniform. A.S. was wearing workout clothes and a pair of sneaker shoes.

23.     Without introducing herself as an EPCC staff member and unbeknown to be a member of the staff, the person confronted A.S. and told A.S. to stay off the fitness floor.

24.     Perplexed, A.S. asked why. The person then said that A.S.'s shoes were wet and hence, prohibited from the fitness floor.

25.     A.S. was confused because he knew his sneakers were dry (he had come neither from the aquatic area nor from directly outside). Even though his sneakers were dry, A.S. assumed that if he wiped his shoes on the carpet located at the top of the stairs, it would satisfy the person (who he later learned was an EPCC staff person) and resolve whatever issue the (staff) person had.

26.     A.S. wiped his shoes on the carpet at the top of the stairs nearby—leaving no residue because his shoes were dry—and proceeded to the fitness floor.

27.     Instead, the uncredentialed staff member became visibly upset with A.S. when A.S. proceeded to a treadmill on the fitness floor.

28.     A.S. observed that the uncredentialed EPCC staff member remained visibly upset, and then spoke to A.S. in a raised volume and harsh tone about disobeying the directive to stay off the fitness floor. She then asked A.S. to stay off the treadmill until his shoes dried. At no point during the interaction were A.S.'s shoes wet, they were dry.

29.     A.S. did not argue with or raise his voice with the staff person, but instead ignored the person and continued to use the treadmill. Apparently frustrated, the staff

person immediately left in a hurried manner to what was later learned, to report A.S. to the fitness floor manager.

30.     Again, it was later learned the staff person reported to the fitness floor manager that A.S. had wet sneakers, disobeyed her request for A.S. to stay off the fitness floor, and specifically the treadmill, yet, knowing what A.S. had told her apparently did not tell the fitness floor manager that A.S. had wiped them on the carpet before entering the fitness floor area.

31.     Meanwhile, Tom Styczinski came to the fitness floor and also started using a treadmill near the treadmill A.S. was using.

32.     The fitness floor manager then approached A.S.

33.     The fitness floor manager began speaking to A.S. During the conversation, A.S. described how he thought the uncredentialed staff member was angry with him and believed the staff member's behavior as inappropriate considering the circumstances.

34.     Then, the fitness floor manager became visibly upset with A.S. and accused A.S. of having wet sneakers on the treadmill. At this juncture, as Jenny arrived at the treadmills, Tom, having observed the interaction, stopped his exercise, approached A.S. and confirmed and verified in front of the fitness manager that indeed A.S.'s shoes were dry and that no moisture was visible on the treadmill itself. Jenny did the same and verified Tom's findings in front of the manager.

35.     The fitness floor manager then verified that A.S's sneakers were not wet.

36.     In a turn of events, despite these observations, the fitness floor manager now shifted the issue to A.S.'s type of sneakers, stating that it did not matter that A.S.'s shoes

were not wet because they were "street shoes." There were signs posted which said "No Street Shoes," and the EPPC policy mentioned that inappropriate and prohibited footwear in the gym or fitness floor area, included, "sandals, slides, Crocs, boots, or bare feet." **EPCC Policies, Exhibit 12.**

37.    Jennifer, Tom, and A.S. have never observed patrons of the EPCC changing shoes before entering the fitness floor. Rarely, they have seen non-athletic footwear (such as boots) in the locker room shoe trays, which are almost always empty.

38.    The fitness floor manager declared to Jenny and Tom that there must be some "consequences" for A.S, but it was not clear from her words what she thought A.S. had done that required "consequences," nor what she was suggesting those consequences should be.

39.    Tom Styczinski then requested to speak with the manager on duty. The fitness floor manager explained that she was a manager. Tom asked to speak to someone above her.

40.    Another manager ("manager on-duty") came and Tom asked to speak with her in the office.

41.     Tom Styczinski told the manager on-duty that he had observed the conduct of a previous EPCC staff person that had approached A.S. while on the treadmill and the behavior of the fitness manager when that manager interacted with him, Jenny, and A.S. about the accusations of A.S.'s "wet sneakers." Styczinski described the behavior as "angry" and inappropriate.

42.     The on-duty manager assured Tom Styczinski that she would talk with both staff members about their behavior, and specifically that she would communicate that it is not appropriate to get so visibly angry with a minor.

43.     The next week, Tom observed that A.S.'s same sneakers—though again, clean and dry—make a squeaky sound while A.S. walked on the same stairs to the EPCC fitness floor.

44.     Tom had thought the situation was resolved amicably.

45.     But then, much to the Styczinski's surprise, two days later on April 7, 2022, Jennifer Styczinski received an email from EPCC Manager Valerie Verley. **Exhibit 2.** The Verley email threatened the Styczinski family's membership to EPCC. *Id.*

46.     The email stated that

- it was inappropriate for Tom Styczinski to ask to speak to the on-duty manager; and
- accused Tom as being pretty rude and disrespectful toward staff.

*Id.*

47.     Although Verley had not witnessed the April 5th incident on the fitness floor, and she had not been present when the Styczinskis spoke with either manager, it is notably that she:

- never asked the Styczinskis for their side or version of events of what happened on April 5, 2022 either in her April 7, 2022 email or later; and

- failed to directly notify Tom Styczinski of her email statements.

*See Id*

48.     Jenny and Tom Styczinski were informed that the EPPC does video surveillance of the EPPC's gym-fitness floor area. As such, the EPPC or the City has possession of video surveillance recordings.

49.     Jenny and Tom Styczinski do not have copies of any EPPC video surveillance recording of the EPPC's gym-fitness floor area.

50.     Upon information and belief, the EPPC or the City or both, had possession of the fitness floor area video surveillance recordings of the April 5, 2022 encounter between the Styczinski family and the EPPC staff, including the on-duty manager for at least a two-week retention period after April 5, 2022.

51.     The April 5, 2022 fitness floor area video recordings would have been available for review by EPPC staff, managers, or other City governmental officials in the days or weeks following the April 5th encounter.

52.     Had the fitness floor area video recordings been reviewed, it would have revealed that throughout the encounter Tom Styczinski and his A.S. had remained calm, and did not raise their voices. *See* **Exhibit 2.**

53.     Verley, as the Community Center Manager and author of the email to Jenny Styczinski of April 7, 2022, had either failed to review the video footage of the April 5, 2022 encounter or willingly made misrepresentations of that video recording footage because she included false statements about the demeanor of both Tom Styczinski and A.S.

54.     Again, throughout the encounter Tom Styczinski and A.S. had remained calm, and did not use raised voices. *See,* **Exhibit 2.**

55.     The EPPC also keeps files or retains documentation on individuals in which staff, the managers, or the City have provided warnings about such matters as inappropriate behavior, the suspension of individuals or families or both, and those that have been temporarily or permanently expelled from the EPPC premises.

*The July 15 Lap Pool interaction with EPPC staff.*

56.     Three months later, on July 15, 2022, Jenny and Tom Styczinski, and A.S. were in the EPCC's aquatics area where they witnessed inappropriate behavior by EPPC lifeguards of the area referred to as Lap Pool B. The lifeguards were relatively young adults or of high-school age.

57.     Because the aquatics area was a primary reason for joining the EPCC as members, the Styczinski family, they were familiar with EPCC aquatic area rules and norms from their years of using the aquatic area.

58.     On July 15, 2022, the Styczinski family visited the EPCC. Jenny Styczinski went to aquatics area to the pool referred to as Lap Pool B. A.S. brought along a friend, who was a minor boy both of whom accompanied Jenny to the pool.

59.     EPPC video footage of Lap Pool B from July 15, 2022 shows the incident that would occur as described in the allegations asserted. **Exhibit 3** (MP4 copy).

60.     Upon their arrival to Lap Pool B, the Styczinski family noted other young men also using the Lap Pool. The young men were believed to be teens.

61.     Soon after their arrival to Lap Pool B, Jenny Styczinski observed EPCC lifeguards blowing their whistles and yelling at the young men. Previously, Jenny had been observing the young men taking turns at the diving board; no loud voices were heard other

than cheering each other on and being orderly. Knowing the rules for the aquatics area, she did not observe any misbehavior by the young men. **Exhibit 3** (30:00 on recording)**.**

62.     Jenny was standing on the pool deck overheard some of the young men asking the lifeguards what they were doing wrong and did not overhear any answers from the lifeguards.

63.     Soon after the exchange between the lifeguards and the young men, the lifeguards closed access to the diving board, yet, Jenny Styczinski, who had been observing the actions of the young men at the diving board and reactions of the lifeguards, could not discern what lead to the closing of the diving board. *See e.g.,* **Exhibit 3** (circa 30:00-46:40).

64.     Once the diving board was closed, Jenny Styczinski observed that many of the young men then went to sit or stand at the side of the pool furthest from the camera.

65.     Soon after that, the lifeguards told the young men to leave the aquatics area. Even here, Jenny Styczinski did not observe any misbehavior of the young men. **Exhibit 3** (44:00 although outside of camera angle). Notably, the young men were Black.

66.     During the 45 minutes prior to the lifeguards directing the young men to leave the aquatics area, Jenny Styczinski had been around Lap Pool B, and did not observe any misconduct or wrongdoing on behalf of the young men.

67.     Jenny Styczinski overheard one of the head lifeguards saying to the young men that even if it was just a couple of the young men being problematic, the whole group had to leave. The young men asserted that no one in their group was misbehaving and that the people the lifeguard was talking about were not part of their group. *Id.* (at 46:10).

68. From Jenny's observation of good behavior and no observation of rule or aquatics area norm violations, Jenny believed that the lifeguards were unfairly asking the group of young men to leave and deeply felt that she needed to speak with the lifeguards.

69. Jenny Styczinski then spoke to one of the lifeguards. She vouched for the conduct of the young men as having done nothing wrong and based upon the lifeguard's previous overheard statement that if one person was acting against the rules the entire group had to leave without knowing their relationship to each other. She also expressed her concern that the lifeguards were punishing innocent kids. *Id.* (at 46:33). Later after leaving the EPCC for the day, Jenny realized that the en banc exodus demanded by the lifeguards might have been racially-motivated.

70. Tom Styczinski had arrived to the aquatics area Lap Pool B. *Id.* (at 35:26).

71. After Jenny had spoken with the lifeguards, Jenny and Tom spoke about Jenny's observations and opinions about the lifeguards' behavior.

72. When Jenny and Tom had finished speaking with each other, Jenny left Lap Pool B to go to the fitness floor.

73. Tom spoke with A.S. and A.S.'s friend, both of whom wanted to jump off the diving board, but the diving board was closed apparently due to the previous group of young men who were asked to leave the aquatics area.

74. Tom then spoke to an adult male EPCC staff member (wearing a black shirt) about re-opening the diving board.

75. The lifeguards agreed and reopened the diving board, allowing A.S. and his friend to start jumping off the diving board.

76.     Before A.S. and his friend began using the diving board, Tom Styczinski instructed them to be on their best behavior.

77.     Because A.S. and his friend were minors, and in accordance with the aquatics and pool area rules, Tom Styczinski was the responsible patron and thus, ensured that while they were using the diving board, they remained well-behaved.

78.     From Tom's years of using the EPCC, including the EPCC aquatics area, he was familiar with the rules and norms for using the EPCC aquatics area.

79.     A.S. and his friend began jumping off the diving board. However, Tom observed one of the lifeguards blowing her whistle at most jumps off the diving board, but he did not understand why or what rule(s) were being violated.

80.     Because of the apparent excessive whistle blowing without any explanation of a "rule violation," particularly because Tom was responsible for A.S.'s and his friend's conduct, he sought out a lifeguard for an explanation of the whistle blowing.

81.     Several minutes later, Tom Styczinski swam over to the head lifeguard and expressed his concern about the aggressive and unexplained way the lifeguards were enforcing the unknown rules without identifying what rule(s) were being violated. *Id.* (at 1:09:02).

82.     When Tom asked the lifeguard to explain what rule(s) were being violated, the lifeguard explained it was the rule against "double-jumping," which Tom later learned meant bouncing on the diving board before jumping. At the time, Tom did not know what the lifeguard meant by "double-jumping." The lifeguard explained this was a rule listed on a sheet in the office and posted near the South-West corner of the pool area. To the best of

14

Tom's knowledge, the rule against "double-jumping" was not explained by the lifeguards to those who were the subjects of the whistle blowing.

83.     Soon thereafter, another lifeguard walked over to A.S.'s friend and gave him a dirty look that upset the minor, who told Tom about it. *Id.* (at 1:16:41; 1:22.08)**.**

84.     The lifeguards closed the pool about five minutes before the set pool closing time.

85.     Because the dirty look had upset A.S.'s friend, Tom Styczinski walked over to talk to the head lifeguard to talk to her. *Id.*

86.     During Tom Styczinski's conversation with the head lifeguard, he asked her for the first name of the individual lifeguard who upset A.S.'s friend because the inappropriate behavior, in Tom's view, warranted the filing of a formal written complaint against that lifeguard.

87.     The head lifeguard refused to give Tom Styczinski the other lifeguard's name.

### The EPPC bans the Styczinski family from the aquatic area.

88.     Five days later, on July 20, 2022, Verley, the EPCC's Manager, sent another email to Jenny Styczinski announcing that the Styczinski family were permanently prohibited from access to the aquatics area and further threatening their EPCC membership. Exhibit 4 at 3–4.

89.     Verley based her apparent permanent expulsion from the aquatics area upon the EPPC's Verbal Abuse Policy. **Exhibits 1; 4 at 3–4**.

90.     EPPC's banning of the Styczinskis from the aquatics area was humiliating for the Styczinskis.

15

91.     Use of the aquatics area at EPCC was the primary and most valuable feature of the Styczinskis's EPCC membership.

92.     The ban from use of the EPCC aquatics area was effectively a ban from the entire EPCC for the Styczinskis.

93.     When compared to Verley's characterization of events and interactions with EPPC staff as described in her email to Jenny Styczinski (**Exhibit 4**) and the video footage from the incident of July 15, 2022 (**Exhibit 3**), it reveals misrepresentations of fact.

94.     Verley falsely claims the young Black individuals were asked to leave because they were doing headlocks, and dunking others. **Exhibit 4 at 3**.

95.     Verley falsely claimed the Styczinskis followed the lifeguards on the pool deck. Actually, the video evidence shows lifeguards following Tom Styczinski, and him asking them to stop because it was making him uncomfortable. **Exhibit 3 at 1:16:00-1:16:30; Exhibit 4 at 3**.

96.     Verley falsely said Tom Styczinski was yelling and pointing in the lifeguards' faces. When Tom Styczinski pointed for the purpose of identifying the lifeguard, the video shows the lifeguard was several feet away from Tom Styczinski. **Exhibit 3 at 1:22:08; Exhibit 4 at 3.**

97.     Verley faulted Tom Styczinski for trying to identify the offending lifeguard for purposes of filing a formal report. **Exhibit 4 at 3–4**.

98.     Verley also falsely claimed the Styczinskis called her staff racist, and Verley listed that as a reason for taking the punitive action against the Styczinskis. **Exhibit 4 at 3**.

99. Verley indicated that the Styczinski's speech in two incidents, which were the April 5, 2022 of A.S. reporting harassment, and the July 15, 2022 Styczinski challenge of the inappropriate behavior of the lifeguards, were the but-for cause of her punitive actions. **Exhibit 4 at 3**.

100. On July 21, 2022, the Jenny and Tom Styczinski sent an email to Verley asking for additional clarification on the vague allegations from her July 20 email. **Exhibit 4 at 1**.

101. A day later, on July 22, 2022, Jenny and Tom Styczinski sent an email to Eden Prairie Parks and Recreation Director Jay Lotthammer, forwarding the exchange with Valery Verley (**Exhibit 4**) asking him to preserve the video from both the dive pool, and recreational pool area for the date of July 15. **Exhibit 5 at 1**.

102. On July 25, 2022, Verley responded in red-colored text to the Jenny and Tom Styczinski July 22, 2022 email questions. **Exhibit 6**.

103. In response, Verley could not identify who from the Styczinski party accused her staff of being racist. **Exhibit 6**.

104. The Styczinskis could not have called EPCC staff racist because none of them had realized the lifeguards' actions may have been racially-motivated until after they had left the EPCC for the day.

105. In response, Verley acknowledged that EPCC staff asked a group of Black teenage boys to leave the EPCC pool area on July 15, 2022. Verley said that they were asked to leave for specific rule violations. The Styczinskis were informed that some young men were engaging in dunking and other misbehavior. However, the surveillance video recording shows the young men the Styczinskis observed were not involved in any dunking incidents,

nor did the young men behave in conflict with any rule the Styczinskis knew of for using the pool area, based upon their considerable amount of experience and knowledge of aquatic rules. **Exhibit 6**.

106.     In response, Verley's written claims about the July 15, 2022 interaction and causes of the Styczinskis interaction with staff do not align with what is reflected in the surveillance video (**Exhibits 6, 3**).

107.     Notably, Verley confirmed that the EPPC failed to investigate A.S.'s report of harassment by a staff member from on or about April 5, 2022. **Exhibit 6**.

**The Styczinskis requested meeting with City official results in an investigation without their participation, and affirms the Styczinskis ban from the EPPOC aquatic area.**

108.     At the Styczinskis request, on August 12, 2022, Jenny and Tom met with Jay Lotthammer, then the Eden Prairie's Parks and Recreation Director, and Christine Ruzek, City of Eden Prairie Human Resources Manager.

109.     At the August 12, 2022 meeting, Jenny and Tom Styczinski explained the events and their encounters (including A.S.'s encounter) with EPPC staff of on or around April 5, 2022, and July 15, 2022.

110.     Lotthammer responded by ensuring Jenny and Tom that he took their concerns seriously and would conduct a thorough investigation. Lotthammer also stated that he would report back to them.

111.     In anticipation of their meeting, the Styczinskis provided Lotthammer with a "Recommendations" list that outlined their suggestions for policy improvements. **Exhibit 7**.

112.    On August 31, 2022, Lotthammer notified the Styczinskis by email that he had completed his investigation. **Exhibit 8**.

113.    Lotthammer's August 31, 2022 email claimed that he fully investigated the incidents, however, circumstances show that his investigation was incomplete and his conclusions were inaccurate. *Id.*

114.    Lotthammer's investigation was incomplete in-part because he never asked for the Styczinskis' response to the EPCC staff claims against the Styczinskis.

115.    Notably, Lotthammer's email revealed factual inaccuracies indicating a less then thorough investigation, especially since he failed to interview the Styczinskis. For example:

> (a) Describing the group of young Black individuals as acting dangerous does not comport to the video footage of July 15, 2022;
> (b) conclusions that acknowledged not all of the young Black people asked to leave at the July 15, 2022 incident had been involved in alleged misbehavior, as indicated by the statement "many of those teens were…involved." *Id.* He failed to justify why all of the young individuals were subject to a mandate to leave the area;
> (c) Misidentifying the sex of the manager on duty at the time of the Fitness Floor encounter on or around April 5, 2022. Lotthammer also asserted that "he [the manager on duty] reported Tom being hostile and combative." *Id.*

116.    Lotthammer's investigation was incomplete and/or his conclusions were inaccurate because he made factual errors, for example, misidentifying the sex of the manager on duty at the time of the Fitness Floor incident on or around April 5, 2022. Lotthammer asserted that "he [the manager on duty] reported Tom being hostile and combative." *Id.*

117.    Because the manager on duty throughout the fitness floor incident on or around April 5, 2022 was a woman, this could not have happened the way Lotthammer described it, and could not be accurate.

118.    In turn, Lotthammer told the Styczinskis it was inappropriate for them to step in when they were concerned that EPCC staff was being unfair.

119.    As a result, Lotthammer refused to reverse the punitive action to ban the Styczinskis from the EPPC aquatics area. *Id.*

120.    In addition, Lotthammer refused to address issues raised regarding whether staff acted inappropriately. *Id.*

121.    Nearly a year later, having recognized that there existed no appeal process to their ban from the EPPC aquatic area, the Styczinskis decided on a different tact. On August 1, 2023, the Styczinskis wrote to the Eden Prairie City Manager, Rick Getschow for a reprieve. **Exhibits 9, 10**.

122.    Between August 1, 2023, and September 7, 2023, emails were exchanged between City Manager Getschow and Tom Styczinski. **Exhibit 10**.

123.    Getschow affirmed that (as Eden Prairie City Manager) he is the final decision-making authority for the EPCC matter. ***Id.* at 3**.

124.    Getschow wrote that he would "not be pursuing any further action." ***Id.* at 4**.

125.    Jenny and Tom Styczinski asked Getschow whether their complaint fell under a Section 2.80 of the Eden Prairie Code of Ordinances of City Code that would be appealable as an administrative decision. ***Id.* at 2**.

126.    Section 2.80 of the City Code apparently governs an appeal process for any person aggrieved by an administrative decision made by a City official:

> If any person shall be aggrieved by any administrative decision of the City Manager or any other City official, or any Board or Commission not having within its structure an appellate procedure, such aggrieved person is entitled to a full hearing before the Council upon serving a written request therefor upon the Mayor and City Manager at least five (5) days prior to any regular Council meeting….

127.    Notably, at no time during or after the EPPC official banned the Styczinskis from the aquatic area were they informed that they could appeal the decision.

128.    At no time after Lotthammer's investigation and affirmation of the EPPC's on-duty manager's decision to ban the Styczinskis from the aquatic area, did he give the Styczinskis notice of an appeal process.

129.    While awaiting resolution to the ban from the EPCC aquatics center, the Styczinski family arranged a "swimming trip" to Duluth from September 1-3, 2023, so they could go swimming. The Styczinski family incurred costs for both the swimming and lodging while there. **Exhibit 11.**

130.    The Styczinski family would not have gone on the swimming trip to Duluth but-for having been banned from the EPCC aquatics center.

131.    Sometime between August 31, 2023, and September 7, 2023, City Manager Getschow consulted with the City Attorney. *Id.* at 1.

132.    On September 7, 2023, City Manager Getschow sent an email to Jenny and Tom that is accurately quoted in-part as: "your complaints/concerns related to the incident at the EPCC pool are not applicable to that section of the City Code and does not fit within that arena of an appeal of an administrative decision in 2.80." *Id.* at 1.

133.    Nevertheless, over a year after the encounters with EPPC staff, on that same day, Getschow reversed the ban from the EPPC aquatic area implemented against the Styczinskis for violating the EPCC's Verbal Abuse Policy. *Id.* at 1.

134.    In addition, Getschow's welcomed the Styczinskis to rejoin EPPC which was on a list of requested actions initially provided to him on August 1, 2023. **Exhibit 10 at 1**.

135.    Although initially not being provided with a notice of appeal, the Styczinskis, after finding Section 2.80 of the City Code, suggested to City officials the possible applicability of 2.80 as an appeal process to apply to their situation.

136.    City officials concluded and affirmed to the Styczinskis that the appeal process under Section 2.80 did not apply to the administrative decision by EPPC City officials to permanently ban them from the EPPC aquatic area.

137.    Based upon the City's conclusion that Section 2.80 appeal process did not apply to them, and hence, if any future adverse decision is made against them or any other member of their family, the Styczinskis' have concluded there is no appeal process to challenge an adverse decision.

138.    Because the EPCC's Verbal Abuse Policy was used against the Styczinskis for commenting or otherwise encountering staff regarding occurrences or observations Jenny and Tom might further make, they are fearful of the Policy's being used again to punish their family, especially when there is no appeal process. The Styczinskis fear that the Verbal Abuse Policy will be used against them again has kept them from rejoining the EPCC.

139.    Access to comparable fitness facilities to the EPCC would cost the Styczinski family approximately $250 per month more than membership to the EPCC.

140.    But-for the Verbal Abuse Policy, the Styczinskis plan to rejoin the EPCC.

141.    The Styczinskis plan to continue communicating with EPCC staff if the Styczinskis are concerned about harassment, unfair treatment, misunderstanding or misapplication of rules, or misconduct, by EPCC staff.

142.    On the other hand, because of concerns that the EPCC's Verbal Abuse Policy would be used against them as a means of punishment if they try to raise concerns about harassment, unfair treatment, misunderstanding or misapplication of rules, or misconduct, by EPCC staff to EPCC staff, the Styczinskis have curtailed or stopped communicating to EPCC staff (in their capacities as EPCC staff) and have not rejoined the EPCC.

143.    The Styczinskis are concerned that the EPCC's Verbal Abuse Policy means that they must communicate acquiescence or assent to EPCC staff misconduct through silence.

144.    The Styczinskis are concerned that the EPCC's Verbal Abuse Policy endangers vulnerable individuals and minor children, including Jenny and Tom's special needs daughter, and A.S.

145.    The Styczinskis believe the EPCC or the City retain files, documents, or other records related to actions taken against them.

146.    The Styczinskis are aware that EPCC staff gossiped about their ban from the EPCC aquatics area.

147.    The Styczinskis are aware that EPCC staff have made negative and hurtful statements about the Styczinskis.

148.    Jenny Styczinski was extremely stressed as a result of the EPCC treatment of her and her family and sought treatment from a doctor to address that stress.

149.    The Styczinskis have been unjustly punished and humiliated before from the enforcement of the EPCC Verbal Abuse Policy as-applied, and will not subject themselves to unjust punishment again.

## COUNT I
## FIRST AMENDMENT CIVIL RIGHTS CLAIM (§ 1983)

150.    All previous paragraphs are incorporated as if fully restated to support the claim asserted.

151.    The Free Speech Clause of the First Amendment of the U.S. Constitution, which applies to municipalities, protects speech that criticizes the government as a civil right:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

152.    The Civil Rights Act, 42 U.S.C. § 1983, provides a cause of action for rights protected by the Free Speech Clause of the First Amendment.

153.    Speech that criticizes the government, as political speech, is at the heart of the constitutional protections provided by the Free Speech Clause.

154.    At all times for the events and policies complained of herein, the City of Eden Prairie acting through the EPCC and City of Eden Prairie officials, including, but not limited to Valerie Verley, Jay Lotthammer, and Eden Prairie City Manager Rick Getschow, were acting under the color of law and municipal policy.

155.   City of Eden Prairie officials, including, but not limited to Valerie Verley, Jay Lotthammer, and Eden Prairie City Manager Rick Getschow, know that the First Amendment to the U.S. Constitution protects speech that criticizes the government.

156.   Generally, strict scrutiny is applied to the government regulations regulating constitutionally-protected speech.

157.   Strict scrutiny requires that the government regulation be narrowly tailored to meet a compelling government interest.

158.   The City of Eden Prairie provides certain amenities to its municipal citizens and others, such as the EPCC.

159.   The EPCC is a City owned and controlled community center.

160.   Policies of the EPCC are the policies of the City of Eden Prairie.

161.   The EPCC acts through their staff members, management, and city administrators.

162.   EPCC's Verbal Abuse Policy regulates constitutionally-protected speech, such as the Styczinskis criticizing the conduct of EPCC's staff or officials:

> Verbal abuse is speaking with the intent to demean, humiliate, blame, or threaten. This includes, but is not limited to, name calling, personal attacks, condescension, criticism aimed at the particular individual, degradation, manipulation, blame, accusations, blatantly ignoring staff enforcing building policy and refusing to comply, circular arguments or threatening a particular individual.

**Exhibit 1.**

163.    The Styczinskis believe the EPCC's Verbal Abuse Policy is irrational and vague. To them, it captures all forms of any kind of verbal communications between staff and others.

164.    The Styczinskis believe the EPCC's Verbal Abuse Policy regulates them from pointing out EPCC staff or officials misconduct.

165.    The Styczinskis believe the EPCC's Verbal Abuse Policy requires a *mens rea*—speaking with an intent "to demean, humiliate, blame, or threaten."

166.    The Styczinskis believe the effect of enforcing EPCC's Verbal Abuse Policy requires government officials, without a process, to determine the intent or state-of-mind with which someone makes a statement.

167.    The Styczinskis believe the EPCC officials are not mind-readers. EPCC's Verbal Abuse Policy assumes that criticism is verbal abuse.

168.    The Styczinskis believe the there is no limitation in the EPCC's Verbal Abuse Policy excluding citizen voicing criticisms of EPCC employees.

169.    The Styczinskis believe the EPCC's Verbal Abuse Policy is irrational because it assumes voicing criticism of EPCC employees is verbal abuse.

170.    The Styczinskis believe the EPCC's Verbal Abuse Policy is irrational because it favors feelings of individuals, rather than substance of what is spoken.

171.    The Styczinskis believe that in order to avoid allegations of violating EPCC's Verbal Abuse Policy, a person who otherwise would speak to challenge or criticize a government official's wrongful or erroneous actions would need to stay silent.

172.    The Styczinskis believe the EPCC's Verbal Abuse Policy compels silence is unconstitutional facially or as applied or both.

173.    The Styczinskis believe that government-compelled silence is a form of government-compelled speech that is communication of acquiescence or approval, or both.

174.    In the Styczinskis' case, the EPCC applied the EPCC's Verbal Abuse Policy to the Styczinskis when they voiced concerns about EPCC staff misconduct.

175.    The Styczinskis believe that any government-imposed limitations on speech must be content-neutral.

176.    The Styczinskis believe the EPCC Verbal Abuse Policy is not content neutral because it limits specific topics of speech, including but not limited to, criticism of public officials.

177.    As a result of the Styczinskis' complaints about EPCC employees' misconduct, the EPCC banned the Styczinskis from the EPCC's aquatics area.

178.    The Styczinskis believe the application of the EPCC's Verbal Abuse Policy to citizen speaking complaints against EPCC misconduct deters citizens from complaining about EPCC's staff as governmental officials.

179.    The Styczinskis believe the, for example, the EPCC's Verbal Abuse Policy bans citizens from "blaming" EPCC's staff for actual misconduct during a verbal exchange.

180.    Additionally, the Styczinskis believe the EPCC's Verbal Abuse Policy bans citizens using "circular reasoning" when reporting EPCC employees' misconduct during a verbal exchange.

181.    Therefore, the Styczinskis believe that under the EPCC's Verbal Abuse Policy, they, and others, can be banned from the EPCC for "blaming" EPCC's employees for actual misconduct during verbal exchanges.

182.    The Styczinskis experience of EPCC's Verbal Abuse Policy is that the only way to avoid punishment under the Verbal Abuse Policy is to stay silent when they encounter EPCC employee misconduct.

183.    The Styczinskis believe that consequently, they and others, have their speech chilled by the EPCC's Verbal Abuse Policy.

184.    The Styczinskis believe the EPCC fails to adequately train EPCC employees to respect First Amendment Free speech rights

185.    The Styczinskis believe the EPCC's Verbal Abuse Policy fails strict scrutiny because it is not narrowly tailored to meet a compelling interest.

186.    The Styczinskis believe the EPCC's Verbal Abuse Policy fails strict scrutiny both on its face and as-applied.

187.    The Styczinskis believe the EPCC's Verbal Abuse Policy fails to be rational both on its face and as-applied.

188.    The Styczinskis believe the EPCC Verbal Abuse Policy includes no exception for citizens speaking complaints against EPCC employees.

189.    The Styczinskis believe the EPCC Verbal Abuse Policy both chills speech and compels speech by compelling silence.

190. The Styczinskis believe the EPCC Verbal Abuse Policy use of the words "blaming," "threatening," and "circular reasoning" as just examples of how the policy terms are vague and unconstitutionally overbroad.

191. The Styczinskis believe the EPCC Verbal Abuse Policy, as an adopted City policy is underinclusive; the Policy is applicable only to the Community Center and not applicable to any other Eden Prairie department or facility that is open to the public for use.

192. The Styczinskis were banned from the EPCC aquatic area.

193. The Styczinskis know EPCC staff do act in a manner that is "unprofessional," or treat EPCC patrons unfairly, or both.

194. The Styczinskis have not returned to the EPCC because of their fear of the use of the EPCC's Verbal Abuse Policy. They must remain silent in the face of actual EPCC staff misconduct or unfair treatment if they did return to the EPCC.

195. The Styczinskis know that verbal encounters with EPCC staff that is interpreted as criticism of EPCC staff will result in at least an accusation of violating the Verbal Abuse Policy, which results in banning from the facility, or portions of the facility, without notice of appeal process, and without an appeal process to challenge the ban.

196. The Styczinskis believe the EPCC revoked their pool privileges and deprived them of the primary and most valuable aspect of their EPCC membership because Jenny and Tom Styczinski exercised their right to criticize government action.

197. The Styczinskis believe the EPCC's action to ban them from the aquatic area was in retaliation for Jenny Styczinski's speech, or Tom Styczinski's speech, or both their speech.

29

198.   The Styczinskis were damaged by the EPCC's retaliatory actions.

199.   The Styczinskis are forced to use private facilities, rather than the public facility of EPCC for similar fitness services.

200.   The Styczinskis have been damaged in the application of the EPCC's Verbal Abuse Policy to them: being banned from the EPCC's aquatics area.

201.   The Styczinskis believe they are being damaged by the EPCC's continuing enforcement of the EPCC's Verbal Abuse Policy.

202.   The Styczinskis have been monetarily damaged by going and paying elsewhere to access fitness facilities.

203.   Jenny Styczinski was extremely stressed as a result of the EPCC treatment of her and her family and sought treatment, incurring medical expenses.

204.   The Styczinskis believe the EPCC Verbal Abuse Policy is so overbroad that it captures even respectful, factual speech, or expression of grievances that are critical of EPCC staff, who are government employees.

205.   The Styczinskis believe that while the EPCC Verbal Abuse Policy has a *mens rea* intent element, it has no corresponding due process procedure to adjudicate whether a person spoke with a policy-implicating "intent."

206.   The Plaintiffs seek in this lawsuit monetary damages, including nominal damages, compensatory damages, and prospective declaratory and injunctive relief.

## COUNT II
## DUE PROCESS CLAIM (§ 1983)

207.   All previous paragraphs are incorporated as if fully restated to support the claim asserted.

208.    The Fourteenth Amendment to the United States Constitution prohibits depriving any person of life, liberty, or property without due process of law, and also prohibits states from abridging the privileges and immunities of citizens of the United States.

209.    The EPCC Verbal Abuse Policy has a *mens rea* element as it includes "speaking with the **intent** to demean, humiliate, blame, or threaten," yet it has no corresponding due process procedure to adjudicate whether a person spoke with a policy-implicating intent.

210.    EPCC-users have a property interest in the use of the EPCC, in-part as taxpayers, in-part as citizens and residents of Eden Prairie, and in-part because they pay a day use or membership fee.

211.    The EPCC Verbal Abuse Policy assumes a speaker's intent without the opportunity to present evidence or cross-examine an accuser.

212.    The EPCC Verbal Abuse Policy assumes the speaker is guilty of verbal abuse.

213.    The EPCC Verbal Abuse Policy provides no means for the accused to provide a defense or refutation of the accusation of verbal abuse.

214.    The City of Eden Prairie admits that Section 2.80 of the City Code governing the appeal of decisions of governmental official decisions is not applicable to EPCC governmental official decisions regarding violation of the EPCC Verbal Abuse Policy.

215.    The EPCC Verbal Abuse Policy provides no provision for an appeal of any decision of any government official (inclusive of EPCC staff) resulting in a punishment for violating the Policy.

216.    Violating the EPCC Verbal Abuse Policy provides for punishment if a determination of a violation has occurred, including but not limited to being banned from part of the EPCC or prohibited access to the EPCC, either temporarily or permanently.

217.    That having access to all parts of the EPCC is a City created property interest provided to members and residents of Eden Prairie.

218.    The Styczinskis are residents of Eden Prairie and were members of the EPPC.

219.    The Styczinskis, when accused of violating the EPCC Verbal Abuse Policy and banned by, Valerie Verley, the EPCC manager on-duty, Verley failed to give the Styczinskis any notice of appeal.

220.    Verley is aware of the right to free speech under the First Amendment and is applicable to the Styczinskis.

221.    Likewise, the City of Eden Prairie is aware of the right to free speech under the First Amendment and is applicable to the Styczinskis.

222.    When Jay Lotthammer, then City Director of Parks and Recreation completed his investigation resulting in the affirmation of the EPCC ban affecting the Styczinskis, he failed to give notice of appeal process regarding that decision.

223.    Jay Lotthammer is aware of the right to free speech under the First Amendment and is applicable to the Styczinskis.

224.    In the alternative, if Verley and Lotthammer are not aware of the right to free speech under the First Amendment and is applicable to the Styczinskis, even when exercised in the EPCC, the City of Eden Prairie failed to adequately train Verley and Lotthammer, and

others regarding protected free speech in relation to any enforcement of the EPCC's Verbal Abuse Policy.

225.    The EPCC Verbal Policy fails to provide for an appeal process regarding punishment for allegations of violating the Policy.

226.    The omission of an appeal process was an intentional act by the City.

227.    The intentional omission of an appeal process will and has resulted in arbitrary and capricious applications of the Policy.

228.    The intentional omission of an appeal process by the City is a policy to deprive persons subject to and receiving punishments under the Verbal Abuse Policy of due process.

229.    While the City provides a property interest through EPCC membership to its residents and others, the City provides no process to protect those interests.

230.    The Verbal Abuse Policy violates due process protections by depriving EPCC-users of their property interest in using the EPCC without due process of law.

231.    As-applied, the Styczinskis were punished for Jenny and Tom's speech without the opportunity to defend themselves from the accusation that their speech was done with intent to verbally abuse.

232.    As-applied, the Styczinskis did not have the opportunity to refute the assertion of intent to abuse or offer their side of events as part of EPCC staff investigations.

233.    The Styczinskis family plaintiffs were harmed by the City's deprivation of their property interest in the full use of the EPCC as a result of the due process violation.

234.    The City of Eden Prairie, Verley, and Lotthammer acted individually or in concert to deprive the Styczinski family of due process protections afforded to them under the Fourteenth Amendment.

235.    As a result of the deprivation of due process, and based upon the allegations asserted, the Styczinskis are entitled to declaratory and injunctive relief.

**PRAYER FOR RELIEF**

For the reasons stated in this complaint, the Plaintiffs Thomas Styczinski, Jennifer Styczinski, and A.S. request that this Court grant the following relief:

1.  Enter a declaratory judgment finding that the City of Eden Prairie's adopted EPCC's Verbal Abuse Policy violates the First Amendment's Free Speech Clause;

2.  Issue an order granting injunctive relief enjoining EPCC's Verbal Abuse Policy as it violates the First Amendment Free Speech Clause;

3.  Enter a declaratory judgment finding the City of Eden Prairie's adopted EPCC's Verbal Abuse Policy violates the Due Process Clause of the Fourteenth Amendment;

4.  Issue an order granting injunctive relief enjoining EPCC's Verbal Abuse Policy as it violates the Due Process Clause of the Fourteenth Amendment;

5.  Issue a declaratory judgment that Plaintiffs have prevailed on their 42 U.S.C. § 1983 claims;

6.  Grant Plaintiffs actual damages resulting from their loss of use of EPCC and nominal damages for the first-amendment violation;

7.  Grant Plaintiffs nominal damages for prevailing on their 42 U.S.C. § 1983 claims;

8.  Grant Plaintiffs their reasonable attorney fees, costs, and expenses incurred and

authorized under 42 U.S.C. § 1988 and other applicable laws; and

    9.   Grant such other and further relief as is just and appropriate.

Dated: July 9, 2024

                            /s/ Elizabeth A. Nielsen
                            Elizabeth A. Nielsen, No. 0403696
                            Erick G. Kaardal, No. 229647
                            Mohrman, Kaardal & Erickson, P.A.
                            150 South Fifth Street, Suite 3100
                            Minneapolis, Minnesota 55402
                            Telephone: 612-341-1074
                            Email: nielsen@mklaw.com
                            Email: kaardal@mklaw.com
                            *Attorneys for Plaintiffs*