# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Jennifer Styczinski and Thomas Styczinski, *on behalf of the minor A.S.*, | File No. 24-CV-2664 (JMB/ECW) |
| Plaintiffs, | |
| v. | **ORDER** |
| City of Eden Prairie; Valerie Verley, *in her individual and official capacity as Community Center Manager or her successor in their official capacity*; and Amy Markle, *in her official capacity as the City's Parks and Recreation Director, or her successor in their official capacity*; | |
| Defendants. | |

Elizabeth A. Nielsen and Erick G. Kaardal, Mohrman, Kaardal and Erickson, P.A., Minneapolis, MN, for Plaintiffs Jennifer Styczinski and Thomas Styczsinki.

John M. Baker and Katherine M. Swenson, Greene Espel PLLP, Minneapolis, MN, for Defendants City of Eden Prairie, Valerie Verley, and Amy Markle.

This matter is before the Court on the parties' cross-motions for summary judgment. (Doc. Nos. 29, 33.) For the reasons explained below, the Court grants Defendants City of Eden Prairie's, Valerie Verley's, and Amy Markle's motion and denies Plaintiffs Jennifer Styczinski's and Thomas Styczinski's motion.

## STATEMENT OF UNDISPUTED FACTS

In this action, brought pursuant to 42 U.S.C. § 1983, Plaintiffs Jennifer and Thomas Styczinski, on behalf of their minor son A.S., claim that their free-speech and due-process

rights were violated when the Eden Prairie Community Center (EPCC) revoked their access to its Aquatic Center.  The parties cross-move for summary judgment.

Defendant City of Eden Prairie (the City) owns and operates the EPCC.  (Doc. No. 35-9 at 18:25–19:06.)  Plaintiffs became EPCC members in 2015.  (Doc. No. 35-1 at 40:11–40:13.)  In doing so, they agreed to abide by the EPCC's policies, which included the "Behavioral Guidelines: Verbal Abuse" policy (the Policy).  The Policy applies when "a participant demonstrates threatening or personalized abusive behavior toward staff members and/or other patrons."  (Doc. No. 35-20 at 3.)  The Policy states as follows:

> Verbal abuse is speaking with the intent to demean, humiliate, blame or threaten the person spoken to.  It includes, but is not limited to, name calling or personal attacks, condescension, criticism aimed at the particular individual, degradation, manipulation, blame, accusations, blatantly ignoring staff trying to enforce building policy and refusing to comply, circular arguments or threatening a particular individual.

(*Id.*)  It lays out "Progressive Consequences" and includes that "staff will determine if an incident rises to the level where disciplinary action is warranted."  (*Id.*)  Two main incidents at the EPCC set the backdrop for this lawsuit.

### A.    Fitness Center Incident

Plaintiffs Thomas and Jennifer Styzcinski, their teenage children, son A.S., and a daughter, visited the EPCC on April 5, 2022.  A.S. wore his tennis shoes, with which he walked through the wet parking lot, into the Fitness Center, violating the Fitness Center's rule against "outside shoes."  (Doc. No. 35-6 at 22:16–26:21; Doc. No. 35-7 at 93:22–95:25.)  Fitness Instructor Kelly Henderson approached A.S., introduced herself, and instructed him to dry his shoes, as required by her job duties.  (Doc. No. 35-6 at 28:21–

32:17.) A.S. initially ignored her, then walked away toward a treadmill as Henderson was speaking to him. (*Id.* at 31:7–31:12.) Although Henderson instructed A.S. to wait for a few minutes to allow his shoes to dry, A.S. disregarded the directive and began using the treadmill anyway. (*Id.* at 31:07–31:14.) Henderson then spoke with Fitness Lead Jill Bickler. (*Id.* at 31:15–18; Doc. No. 37 ¶¶ 2, 8.)

Bickler approached A.S. and asked to speak with him about his interactions with Henderson. (Doc. No. 35-6 at 41:19–41:25; Doc. No. 37 ¶¶ 11, 14.) After initially dismissing Bickler, A.S. told her that Henderson was harassing him. (Doc. No. 37 ¶¶ 15–16.) Bickler gathered that Thomas was nearby and asked to speak with him. (*Id.* ¶¶ 19–20.) Jennifer then approached and touched her son's shoes "all around" and confirmed that they were dry. (Doc. No. 35-7 at 91:17–91:25, 102:18–22.) Thomas told Bickler he wanted to speak with her manager. (Doc. No. 35-7 at 105:20–106:05.) The Manager on Duty, Julie Krull, spoke with Thomas. (Doc. No. 35-6 at 47:17–48:20; Doc. No. 37 ¶¶ 24–26.) Simultaneously, the Styczinskis' fifteen-year-old daughter was behaving in an unsafe manner nearby. (Doc. No. 37 ¶¶ 30–33.)

Two days later, Defendant Valerie Verley, the EPCC's manager, emailed Jennifer about what occurred at the Fitness Center, highlighting that everyone needed to follow the EPCC's behavior guidelines. (Doc. No. 35-20 at 2.) Verley cautioned that if issues continued, the Styczinskis would jeopardize their membership and "further conversations will need to be had." (*Id.*) Jennifer did not respond or share the email with Thomas until after the Aquatic Center Incident (discussed *infra*). (Doc. No. 35-7 at 122:07–124:1.)

### B.    Aquatic Center Incident

On July 15, 2022, Jennifer, Thomas, A.S., and his friend L.M. visited the EPCC.  (*Id.* at 125:09–125:21.)  Jennifer, A.S., and L.M. went to the Aquatic Center. (*Id.* at 126:18–127:03.)  A.S. broke the rules for the diving board by running and not waiting for the previous diver to swim away. (*Id.* at 171:05–173:16; Doc. No. 35-1 at 30:05–30:10.)  This caused the lifeguard to close the diving board, but A.S. disregarded the closure and immediately climbed on the diving-board ladder and railing until he was told to stop.  (Doc. No. 35-6 at 94:19–95:24; Doc. No. 35-1 at 34:15–35:08.)

In an unrelated matter earlier that day, a group of 15 to 20 teenage boys had been asked to leave after misbehaving in the pool.  (Doc. No. 35-8 at 82:12–82:18, 118:16–118:24, 154:24–155:11; Doc. No. 36 ¶¶ 4–8.)  Jennifer overheard the conversation that Mayia Melchert, the head lifeguard, was having with them.  (Doc. No. 35-1 at 44:05–44:20; Doc. No. 35-7 at 209:09–209:22.)  Jennifer then intervened.  (Doc. No. 35-7 at 197:9–197:14.)  Jennifer became visibly angry, gesturing, waiving her arms, and pointing emphatically.  (Doc. No. 35-1 at 46:33–49:05.)  Observing that Jennifer was growing frustrated, Melchert, following her training, asked Jennifer to write down her contact information.  (Doc. No. 35-8 at 24:06–24:19, 119:21–120:09; Doc. No. 35-7 at 201:22–201:25.)  She did so.  (Doc. No. 35-1 at 49:18-49:56.)

Jennifer left the Aquatic Center and Thomas arrived.  (*Id.* at 25:24–35:30, 45:34–54:45.)  Thomas asked the lifeguards to reopen the diving area, which they did, and subsequently A.S. and L.M. repeatedly broke the diving area's posted rules.  (*Id.* at 59:22–59:30, 1:08:32–1:08:42.)  Thomas approached Melchert to discuss lifeguards blowing their

whistles too frequently.  (Doc. No. 35-5:147:07–15; Doc. No. 35-6 at 124:16–22.)  While Thomas was in the pool and Melchert was crouched on the pool deck, Thomas began gesturing with his hands, pointing, and shaking his finger and fist at her.  (Doc. No. 35-1 at 1:09:30–1:14:23; Doc. No. 35-5 at 175:22–177:05; Doc. No. 35-8 at 149:23–150:03.)  He emerged from the water and continued to be upset with Melchert and other staff.  Melchert directed Thomas to review the rules, posted on the wall.  (Doc. No. 35-1 at 1:15:12–1:16:00.)

L.M. reported to Thomas that a barefoot, teenage lifeguard had given him a "dirty look" earlier, and Thomas decided to find Melchert to make a formal complaint against the lifeguard.  (Doc. No. 35-5 at 192:22–194:21, 196:19–197:12.)  Thomas asked Melchert for her name and the name of the barefoot lifeguard, and she informed him that she could not provide them, as both were minors.  (Doc. No. 35-5 at 198:04–199:15; Doc. No. 35-8 at 89:25–90:07, 147:25–148:06.)  Per her training, Melchert asked Thomas to write down his contact information, and he did so.  (Doc. No. 35-8 at 24:06–24:19, 137:05–137:07.)  Thomas followed two minor female lifeguards out the door, and called out to the barefoot lifeguard that he would be complaining about her.  (Doc. No. 35-5 at 201:20–202:15.)

While Thomas later admitted he was "a little agitated," Thomas minimized his previous threatening demeanor; in Melchert's view, Thomas was at a level of very "elevated anger," "screaming," "very animated, very loud," and in Melchert's "personal space," which caused Melchert to feel physically threatened.  (*Id.* at 185:07–185:12; Doc. No. 35-8 at 65:19–65:20, 77:02–12, 148:04–148:21, 150:1-3.)  Melchert and the other lifeguards were troubled by the unusual situation with Plaintiffs.  (Doc. No. 35-8 at 79:02–79:16.)  The

barefoot lifeguard began crying when they left.  (*Id.* at 79:17–79:20.)  Five lifeguards completed a "General Aquatic Patron Conflict Form" that evening.  (*Id.* at 44:20–44:21; Doc. No. 35-19.)

### C.    Plaintiffs' EPCC Membership

The following week, Verley met with Melchert and another lifeguard who were in tears "about coming back to work if members of the [Styczinski] family came back."  (Doc. No. 35-9 at 120:25–121:06.)  On July 20, 2022, Verley, after reviewing the detailed lifeguard reports, conversing with the head lifeguard on the shift when the group of teenagers initially misbehaved, Melchert, and the barefoot lifeguard, revoked Plaintiffs' Aquatic Center access, concerned for staff safety.  (*Id.* at 191:03–191:05; Doc. No. 35-20 at 2.)  Verley emailed Plaintiffs about this decision and attached a copy of the Policy, explaining that their broader membership to the EPCC was in jeopardy.  (Doc. No 35-20 at 1.)  The next day, July 21, 2022, Thomas emailed multiple questions to Verley, and asked that she cancel the family's membership with the EPCC and issue a pro-rated refund.  (Doc. No. 35-22 at 1–3.)

On July 22, 2022, Thomas began an email exchange with then-City Parks and Recreation Director, Jay Lotthammer, ultimately requesting a meeting of "at least 2 hours" with him and a "diversity representative."  (Doc. No. 35-26 at 2.)  The meeting took place on August 12, 2022, with Thomas, Jennifer, Lotthammer, and a human resources manager from the City, and lasted approximately one-and-a-half hours.  (Doc. No. 35-5 at 227:05–227:22; Doc. No. 35-7 at 279:06–279:23.)  On August 31, 2022, Lotthammer emailed Jennifer and Thomas, informing them that he was declining to reverse "any actions taken." (Doc. No. 35-30 at 5.)  Thomas responded, asking how to appeal Lotthammer's decision.

6

(*Id.* at 4.)  Lotthammer replied that if Jennifer and Thomas would like him to, he would review it with the City Manager, Rick Getschow, but they did not ask him to.  (*Id.* at 2; Doc. No. 35-5 at 236:02–236:21.)  Lotthammer stated, "I think it is important to reiterate that our decision is based on your behavior and is supported by similar reports from over 10 different people.  Many of these people cite your behavior as threatening and making them feel fearful of you."  (Doc. No. 35-30 at 3.)

Nearly a year later, on August 1, 2023, Thomas wrote to Getschow, asking that Verley and Lotthammer be disciplined and that Plaintiffs' full rights to the EPCC be restored.  (Doc. No. 35-32.)  Getschow responded that he would not pursue any action against Verley or Lotthammer, as their decisions were appropriate, but that Plaintiffs were welcome to rejoin the EPCC and use the Aquatic Center.  (Doc. No. 35-33 at 3, 5.)

### D.    This Action

This lawsuit followed.  Plaintiffs claim that Defendants violated their right to free speech under the First Amendment and due process under the Fourteenth Amendment, bringing both facial and as-applied challenges.  Plaintiffs seek declaratory and injunctive relief, as well as damages and attorney's fees.

### ANALYSIS

Defendants now move for summary judgment as to all of Plaintiffs' claims (Doc. No. 33), and Plaintiffs move for partial summary judgment as to their facial claims for violations of their free-speech and due-process rights (Doc. No. 29).  Because no reasonable juror could find in Plaintiffs' favor on any claim given these undisputed facts, the Court grants Defendants' motion.

As a threshold matter, the Court observes that summary judgment is warranted if there is no genuine dispute as to any material fact or the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), a "genuine" dispute of material fact only exists if "a reasonable jury could return a verdict for either party." *Peter v. Wedl*, 155 F.3d 992, 996 (8th Cir. 1998).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (reversing denial of summary judgment because the district court "rel[ied] on such visible fiction" where the video evidence clearly favored the moving party); *see also, e.g.*, *Wallingford v. Olson*, 592 F.3d 888, 892 (8th Cir. 2010) (reversing denial of summary judgment because video evidence "clearly contradicts the version of the story told by [non-moving party]"); *O'Neil v. City of Iowa City*, 496 F.3d 915, 917 (8th Cir. 2007) (observing that summary judgment is proper when "no reasonable jury could believe" the non-moving party's view of the facts) (quotation omitted).

## I.    PLAINTIFFS' AS-APPLIED FIRST AMENDMENT CLAIM FAILS

Plaintiffs allege Defendants violated their free-speech rights by applying the Policy to them, which resulted in losing their access to the Aquatic Center.  However, because as a matter of law, the EPCC is a non-public forum and Plaintiffs present no argument that the

Policy is unreasonable, and because Plaintiffs' conduct—not speech—violated the Policy, the Court grants Defendants' motion as to this claim.

"An as-applied challenge consists of a challenge to the statute's application only as-applied to the party before the court." *Republican Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785, 790 (8th Cir. 2004). "If an as-applied challenge is successful, the statute [or Policy] may not be applied to the challenger, but is otherwise enforceable." *Id.* In addition, content-based restrictions are permissible in non-public fora. *See Fams. Achieving Indep. & Respect v. Neb. Dep't of Soc. Servs.*, 111 F.3d 1408, 1421–22 (8th Cir. 1997) (allowing content-based restrictions to serve the purposes of the forum). "In placing limits on the forum, the government cannot engage in viewpoint discrimination, but it can engage in content discrimination to preserve 'the purposes of that limited forum.'" *Viewpoint Neutrality Now! v. Regents of Univ. of Minn.*, 516 F. Supp. 3d 904, 919 (D. Minn. 2021) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–30 (1995)). "In addition to being viewpoint neutral, a restriction on access to a limited public forum must be 'reasonable in light of the purpose served by the forum.'" *Id.* at 920 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)).

Defendants first argue that the Court should grant the motion as to Plaintiffs' as-applied claim because the EPCC is not a public forum. "In defining the parameters of a speaker's First Amendment right of access to public property, the Supreme Court looks first to the nature of the forum the public entity is providing." *Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*, 640 F.3d 329, 334 (8th Cir. 2011). Government property that "is not by tradition or designation a forum for public

9

communication" is a nonpublic forum. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983). Here, there is no evidence presented that the City held out the EPCC as a forum for public discourse, and the Court concludes that the EPCC is not a public forum. Defendants further argue that unbridled free speech would be dangerous at a pool, as it could impede lifeguards' ability to do their jobs and create a safety risk. Thus, the City "has a significant interest in providing pool-side safety, not to mention preserving a pleasant atmosphere for its paying patrons" because "[a] pool deck is a precarious place for unbridled free speech—any disruptions could distract the lifeguards and compromise safety." *Presnick v. Delaney*, 110 F. Supp. 2d 74, 79 (D. Conn. 1999). Absent any contrary argument (Plaintiffs offer none) and given the clear weight of authority, the Court concludes that the Policy is reasonable and limited to serve the purposes of the EPCC.

In addition, Defendants separately argue that Plaintiffs violated the Policy provisions concerning conduct, not speech. Again, the Court agrees. The First Amendment does not prohibit restricting conduct that may incidentally burden speech. *See Brandt by & through Brandt v. Griffin*, 147 F.4th 867, 889 (8th Cir. 2025). "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id.* (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)). The EPCC revoked Plaintiffs' access to the Aquatic Center due to their behavior. The undisputed facts demonstrate that Plaintiffs' conduct violated the Policy in three ways. First, A.S. wore outside shoes into the Fitness Center and disregarded staff's directions to comply with the rules. Second, Thomas behaved in a threatening and harassing

10

manner toward staff by aggressively getting close to Melchert and following two lifeguards around the deck. Third, Jennifer interfered with the lifeguard's attempts to enforce rules with the group of teenagers at the pool. The Policy's restrictions on conduct did not unlawfully restrict Plaintiffs' speech; there is no First Amendment right to wear wet shoes in a fitness center, ignore staff, get in someone's personal space while screaming at them, or interfere with a lifeguard's attempt to enforce safety rules with swimmers.

For each of these reasons, the Court grants Defendants' motion for summary judgment in their favor on Plaintiffs' as-applied First Amendment claim.

## II.    PLAINTIFFS' FACIAL FIRST AMENDMENT CHALLENGE FAILS

To evaluate a facial First Amendment challenge, courts ask whether "a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (quotation omitted). "Plaintiffs can prevail on their facial challenge only if they show 'that application of the [Policy] will lead to the suppression of speech.'" *Viewpoint Neutrality Now!*, 516 F. Supp. 3d at 917 (quoting *Victory Through Jesus Sports Ministry Found.*, 640 F.3d at 337).

The first step is to assess the Policy's scope, *Moody*, 603 U.S. at 724, given the text of the Policy, *Hershey v. Jasinski*, 86 F.4th 1224, 1231 (8th Cir. 2023). The Policy applies only to behavior within the EPCC and it restricts only "threating or personalized abusive behavior toward staff members and/or other patrons" and "verbal abuse," with the speaker intending to "demean, humiliate, blame, or threaten." (Doc. No. 35-20 at 4.)

The second step under *Moody* is to balance the Policy's applications that violate the First Amendment against its non-violating applications. *Moody*, 603 U.S. at 725. Plaintiffs

11

contend that the Policy is not viewpoint neutral, because it is silent as to whether patrons may compliment staff but contains limitations on criticizing staff. Because this argument mischaracterizes the Policy, it lacks merit. Contrary to Plaintiffs' argument, the Policy does not prohibit patrons from voicing concerns or criticism to or about EPCC staff; rather, it limits the manner in which a patron may voice concerns or criticism. It allows patrons, including Plaintiffs, to communicate their viewpoint—whether positive or negative, compliment or criticism—to the EPCC: patrons could speak to a manager, leave a comment in the comment box, or speak to any employee, assuming that the patron does not behave in a threatening or demeaning manner. To be clear, the Policy does not prohibit patrons from complimenting or criticizing staff, and in this way, it is viewpoint neutral. Regardless of a patron's viewpoint, the Policy prohibits "verbal abuse." (Doc. No. 35-20 at 3.)

In short, as a matter of law, the Policy permits positive and negative feedback and allows patrons to express whatever viewpoint they have, and Plaintiffs fail to show that the Policy leads to the suppression of speech. Therefore, the Court grants Defendants' motion for summary judgment in their favor on Plaintiffs' facial First Amendment claim.

## III.    PLAINTIFFS' DUE PROCESS CHALLENGE FAILS

In Count II, Plaintiffs raise a due process challenge, arguing that Defendants deprived them of their constitutionally protected property interest of "full access" to the EPCC. "A statute, regulation, or official policy pronouncement will give rise to a protected property interest only where (1) it contains particularized substantive standards or criteria that guide the decisionmakers, and (2) it uses mandatory language requiring the decisionmakers to act in a certain way, thus limiting the official's discretion." *Jennings v. Lombardi*, 70 F.3d 994,

12

996 (8th Cir. 1995) (citation omitted).   Plaintiffs do not establish that they have a constitutionally protected property interest in using the EPCC, nor could they, because there exists no constitutionally protected property right in unrestricted access to a public building. *Royer ex rel. Est. of Royer v. City of Oak Grove*, 374 F.3d 685, 689 (8th Cir. 2004) ("[Plaintiff] can point to no property interest in having unlimited access to a public building.").   In addition, based on the undisputed facts, no reasonable juror could disagree that Plaintiffs received adequate due process to satisfy the Fourteenth Amendment. Plaintiffs had ample notice of the Policy and Verley, the EPCC's manager, sent an email to Jennifer reminding her of EPCC's behavior guidelines, shortly after the Fitness Center incident and before the Aquatic Center Incident.   Moreover, Plaintiffs received post-deprivation due process in the form of written answers from the City of Eden Prairie, meeting with the City's Parks and Recreation Director, and obtaining the relief requested: the EPCC offered to restore their full membership, including access to the Aquatic Center.

Therefore, Defendants' motion is granted as to Plaintiffs' as-applied due process claim.  As a result, Plaintiffs' facial due process claim likewise fails.[1]  *See, e.g.*, *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 500 (1982); *U.S. v. Lazzaro*, 637 F. Supp. 3d 640, 646–47 (D. Minn. 2022) (declining to consider facial challenge when party had not prevailed on as-applied claim); *see also Broadrick v. Okla.*, 413 U.S. 601, 610 (1973) (observing "the principle that a person to whom a statute may constitutionally be

---

[1] Because there was no constitutional violation, the Court need not address Verley's argument of immunity.

13

applied will not be heard to challenge that statute on the ground that it may conceivably be

applied unconstitutionally to others, in other situations not before the Court").

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT

IS HEREBY ORDERED THAT:

1.     Plaintiffs Jennifer and Thomas Styczinski's motion for summary judgment (Doc. No. 29) is DENIED.

2.     Defendants City of Eden Prairie, Valerie Verley, and Amy Markle's motion for summary judgment (Doc. No. 33) is GRANTED.

3.     Plaintiffs' claims are DISMISSED WITH PREJUDICE.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  March 30, 2026                          /s/ *Jeffrey M. Bryan*
                                                         Judge Jeffrey M. Bryan
                                                         United States District Court